Our first case is number 23-12273 United States v. Joff Stenroy Philossaint. Mr. Sakin. Yes, good morning. Good morning. May it please the court, my name is Scott Sakin. I'm here on behalf of the appellant, Joff Philossaint, and in this case Mr. Philossaint in September of 2022 was charged with one count of conspiracy to commit wire fraud, two counts of conspiracy to commit money laundering, all arising from a paycheck protection program fraud. In addition to that, Mr. Philossaint entered a plea of guilty to counts one through three of the superseding indictment. Those were the fraud-related counts. He later, there was a second superseding indictment in which he was charged with obtaining citizenship by fraud, and in that charge he went to trial. Really the charges that we're here for regarding the forfeiture counts though, or the forfeiture count, deals primarily with the fraud part of the case, which are counts one through three. The other part of the case about obtaining the citizenship by fraud has no bearing on the issue here, so the trial that took place has little bearing on the forfeiture that's the issue here before the court. The issue regarding the forfeiture is that we believe, and we believe it certainly is shown, that the district court erred in imposing a forfeiture amount of six hundred and seventy three dollars to six hundred and seventy three two hundred and ten dollars. Does this amount exceeded what the defendant, Mr. Joff Philossaint, received and obtained as part of the conspiracy? You take, I think, you take the government's express calculations at sentencing and accept them and say not a cent more, right? The government's calculations at sentencing amounted to five hundred and forty nine thousand two hundred and twenty six dollars, but then the government argued for a figure of six hundred and seventy three thousand two hundred and ten dollars. That's correct. Right, so you're satisfied with the five hundred and forty nine thousand two hundred and twenty six dollar figure. As a matter of fact, Judge Jordan, we conceded to that at the time of sentencing. We expected that would have been what the forfeiture amount would have been. The way that was drawn from is Mr. Philossaint had two loans that he received in total from a company called Royal Elite Transportation and also one from One Solution Group. Those equal to be about three hundred and twenty thousand dollars. Then he also received kickbacks of 19 other loans, which amounted to about two hundred and twenty eight thousand and a little more than that, which equaled five hundred and forty nine thousand two hundred and twenty six dollars. We agreed that that was the correct amount of forfeiture based on the funds that Joff himself received directly either from the Small Business Administration through the PPP or that he received his kickbacks from other co-conspirators who operated the companies or the so-called companies that also received the PPP loan. So yes, we do agree with the five hundred and forty nine thousand. So the government has said that they really are entitled to a forfeiture of three point eight million dollars and so even if the court made an error, they're entitled to a greater amount. My question to you is what is your position with respect to the Young case cited by the government in a supplemental filing with respect to the fact that the defendant controlled the proceeds? Wouldn't that subject the entire amount of the proceeds as property involved in the offense, whether it's under nineteen fifty six nineteen I'm sorry thirteen forty nine nine eighty two, a one forfeiture, wouldn't that subject the entire amount to forfeiture for a forfeiture judgment? Well but there's no record evidence that supports that that proposition. The way that the fraud worked here, other than the two loans that my client received the money directly and we'll put that aside, the other question is the other nineteen that he helped participate in. That money was not sent to him. That money was sent directly by the small business administration would have gone to the the bank or to wherever it was going to and then to the co-conspirator who received the money. The record is clear that our client then received the ten percent of the kickback that he was received either by check or by wire transfer from the co-conspirator. He never had control over that money. He never had that money put into his account. That money went directly into the business account or to the person who was in charge of that particular business and nowhere is a record evidence that he had ever obtained that money which we believe is required. I think the United States versus Young case supports our position because in the Young case, Miss Young received the money and then she gave the money out to other co-conspirators. That's not our factual scenario. Our scenario is completely the opposite in which the money was sent to the co-conspirators who then gave our client the ten percent which was the deal they had worked out for him helping them get this money. That case is completely in opposite and probably supports our position. Can I ask you a question about that? Yes, sir. Judge Covington asked the question, could the district court have subjected you to the full three million through sort of a different kind of analysis? The district court didn't do that though, right? The district court here said the way I'm calculating forfeitures, I'm calculating it based on these specific transactions. Am I understanding the record right? Well, not exactly, Judge Brasher. What happened was the district, the government made, I believe, a math mistake, an arithmetic mistake. I mean, I read the sentencing. What's odd about this is you characterize it as a math or arithmetic mistake but then the government throughout said, no, we don't care about that. We want the specific number even though, yeah, I think you're right in the sense that there's sort of a couple of transactions in there that, given how they reach the number, it doesn't make sense. But the government's position was never at, you know, we're right on the math. Their position was always, I think, at sentencing was just, it doesn't matter, right? Well, no, I believe at sentencing what occurred was they asked for the $673,000 and they justify how they came up with that number. They were taking kickbacks on all 33 of the loans, not 19 of the loans. We said, no, we agree that forfeiture should apply to the 19 loans but not to all 33 because he didn't receive the kickbacks. The government then said, well, we don't really care what you say because we're really entitled to everything. We're really entitled to forfeiture on 3.8. So, I mean, their position was never that he did receive the kickbacks on all 33, right? Well, I don't know. I think it was just a mistake on their part. I don't, I think maybe when it was looked over, maybe it wasn't realized, although their pleadings do contain and the chart that we mentioned that's part of the record of experts in 303-1 certainly sets forth over and over that what our client received were the two loans in full plus he also received the 19 kickbacks which would have equaled 549,000. But if you add all the kickbacks, even the ones he didn't receive, then it equals 673,000. Here's the thing, I guess, so there, I guess, in my mind there are two ways to look at this. One is the way you're sort of pitching, which is that this was a math mistake that is just sort of clear error that, you know, the district court said, you know, the kickbacks apply to all 33 and that was wrong. It just applies to 19. That's just a mistake. And I guess the other way would be sort of a legal ruling that none of this matters at all because he's subject to the full 3 million and so you can just give any amount that's below 3 million as a reasonable estimate. That's not factually supported because he did not receive the 3 million. At no time did the government prove or even suggest that he had obtained all that 3 million. We conceded that he obtained the 549,000. He did not obtain what equaled to be the 3.8 million dollars. As we said, that went directly from the Small Business Administration, how the PPP loan operated into the accounts of the person who owned or operated those companies. He didn't own or operate those companies. There's no evidence that he was the one who was the signatory on the accounts when the money got there. There's no evidence that he received anything but the 10% of those loans. That's what the government asserted throughout the sentencing process. If we were to reverse in your favor and say, look, district court, it looks like you calculated this incorrectly by adding, by using 33 transactions instead of 19, would the government be able to then come in and say, well, we're just going to use a new estimate instead of estimating based on the transactions and the kickbacks. We're going to estimate differently. I think they had their shot at that apple because they presented what they presented at that hearing. They could have presented whatever they thought was relevant and necessary. Even if that was the case, there's just no evidence that was presented throughout the, there was no evidence presented that he had control or could obtain or had that money, that that money was given to him by the co-conspirators other than the 10% or was given to him by the Small Business Administration. The money went to the companies except for his two companies. It seems to me, Mr. Sagan, I want to give you a chance to talk about this for a minute because I'm going to ask your opponent on the other side about it right when he gets up. It seems to me that the government is resting its position on relevant conduct principles from the guidelines and transposing those principles to the forfeiture context. In other words, he is a leader organizer. He was a mastermind of the scheme and under the guidelines, yes, as long as he knew the goal of the conspiracy, acted in furtherance, and everything was reasonably foreseeable to him for guideline purposes, he does get socked with the whole $3.2 million that were the intended proceeds of the conspiracy, but that doesn't necessarily mean that you apply those relevant conduct principles to forfeiture, which is supposed to extract from the defendant a money judgment for money that he or she obtained from the scheme. Judge Warren, you are correct. There are three different concepts, relevant conduct, which is what you're speaking about, which takes all those relevant conduct for purpose of sentencing guidelines. We have the restitution issue, which is not being contested here, which is designed to make the victim whole, and you have the forfeiture concept, which is designed to punish the defendant for his ill-gotten gains. That's what we're talking about, his ill-gotten gains. His ill-gotten gains, as proven at the time of the sentencing, was the $549,000. That's what he received. He never had control over the other monies that are at issue here. Some mastermind, I think if you look at all the amount of money involved and how much he got, it was about 14% of all the proceeds in the case. Whether he's a leader or a mastermind or whatever you want to call him, he did not obtain or take control of the other funds, and that's what separates forfeiture from relevant conduct. We've taken you a little bit over your time, but we'll give you your full time for rebuttal. Thank you very much. Mr. Juman. Thank you, Your Honor. May it please the Court, Robert Juman for the United States. I think the most important thing I can do at the front is to make clear that despite my colleague's description, there were two steps to this fraud. Yes, there were fraudulent loan applications that were submitted, which of course Mr. Felicant was the only one who created the misrepresentations. He's the one who drafted everything. He chose how much payroll to claim, how many employees to claim. That was all him. But there's a second aspect to the fraud, because a fraudulent loan still needs to be repaid. So the second aspect of the fraud was to prevent that loan from having been repaid, and in that step, Mr. Felicant had control of these funds, and he used them and directed ADP to make these fictitious payroll payments. How did he have control of the funds? He was the... Were there any deposits into his accounts or any transmissions of the funds from the co-conspirators to him, aside from the $549,000? He directed the payments from those payroll accounts. That's not my question. There were no payments from ADP to Mr. Felicant. That's correct. And there were no payments by anybody to Mr. Felicant over and above the $549,000. That's absolutely correct, Your Honor, and that really comes down to then how you interpret Honeycutt, because if... So I don't know why you go to Honeycutt, because here's why. The district court says in its order, based on the 10% kickbacks defendant received on loans he assisted others on, and the loans defendant himself received, defendant obtained a total of $673,000. Yes. Isn't that wrong? It is wrong. Okay, why can't we just reverse it and say that's wrong? If the court feels that it's essential that the explanation be accurate, then yes, you should reverse on that basis. Our position is, however, that that's a harmless error, because the number itself was reasonable. It underrepresented the amount that Felicant could have been held responsible for, and... Held responsible for in terms of what? Forfeiture. Tell me one case in the entire United States, before or after Honeycutt, that allows criminal forfeiture, not restitution, not guidelines, to be based on the entire amount of a criminal conspiracy, regardless of what monies a defendant received. That's our interpretation of Honeycutt. I know, and my question to you is, do you know of any case in the country, before or after Honeycutt, that allows forfeiture to be imposed in that manner? No, Your Honor, because, and I'll say, Honeycutt, we cite to it, not because of what actually happened in the case, but because of the hypothetical that the court enunciated. They were saying, this is not that marijuana manufacturer, and that's why we're not ordering joint and sever liability, but we are saying there is this category of cases out there, which we think this falls into. I just think, I just, maybe I'm just missing the whole thing, Mr. Juman, but it seems to me that the government's position is conflating very different sentencing concepts. Yes, he's responsible for the whole 3.2 million dollars in terms of relevant conduct for the guidelines and for his imprisonment sentence. Yes, he's liable for all of that money that was actually paid and not recovered in terms of restitution, but forfeiture is a different animal. It's meant to recover ill-gotten gain from a defendant, and he never got this money. But as this court also pointed out in Young, it has all their purposes. It's also, there's also a penal component to it, a penological component, and that's why, in Young, this court said that the defendant could be held responsible, even for money that didn't end up resting with the defendant. That's because that defendant got the money passed through. So at that point, the defendant got the money, at one point had control of it, and even if the defendant didn't keep it, decided what to do with it. That link is missing here. Well, as we read Young, the court was saying that it doesn't matter how Mr. Filson used the fraudulent proceeds. If he used them for himself, if he sent them to a conspirator. If he got them, he didn't get them. Well, again, we'd say in the second part of the scheme, he has the control to disseminate those funds however he wanted. Now, he used them to further the scheme. That's true. He didn't simply put them into his pocket. His scheme would not have survived very long if he had done that. But the fact is, he had the choice. He had the control, and there's really not much more control anyone would want over money, other than the power to dictate where it goes. So here's, here's my, I have many, many problems with your argument about Honeycut, but the main problem I have is that all of this seems like it could have been a basis for the district court to have awarded the forfeiture on. The district court could have made findings about that, and could have said, here are the findings that justify a forfeiture award of higher than $600,000 on this theory. But there are no fact findings about that, because the district court didn't do that. So it seems like you're asking us to make those fact findings, and for us to make fact findings about whether a higher forfeiture award could have been justified, when the district court didn't do that. What we're relying on, your honor, is the sentencing transcript, in which the, the error, this, this kickback numerical error, was made clear to the judge. The judge knew about it. The government, in fact, was the one who pointed it out, even though the mistake was in the factual proffer that Mr. Filassone agreed to. So at the sentencing, Mr. Filassone says it should just be $549. That's the amount I received. The government didn't dispute that. It said, your honor, district court, $673 is appropriate, because he's a leader. That was the argument on page 70 of the transcript. And the judge, we grant you, does not then say, oh yes, that will now be the basis for my ruling. But the sequence of events, when the judge says, well now the cap will be $673, it's clear that's the argument he's agreeing with. And yes, there's an error in the written order. I mean, there's a written order that says, this is the reason, this is how I've come to the $673 figure, and it's not based on any of that. We concede there's an error. Our point simply is that the, the error is in the description of how the court got to the number, but the number itself is reasonable. So here's, here's a hypothetical, like, so let's say it, let's say you're in the sentence, you're in sentencing guidelines world, and a district court says, look, I find the amount of loss to be a million dollars, and on that, you know, that basis of the amount of loss, here's the sentencing range, and I sentence this person to X. And then the defendant appeals and says the amount of loss isn't a million dollars, like, it's clear on the record the amount of loss is $50,000. Can the government then come in and say, well, the district court could have sentenced them to this anyway, so just, you know, just affirm it, because even though the district court relied on the fact that it was a million dollars and said that the finding was a million dollars, the district court just could have, it could have imposed this higher sentence, so the lower sentence is fine, or this sentence is fine. I, I think the, the issue in this case is that there was never a dispute that 3.8 million was the right amount. Well, I mean, that makes it even weirder, right? It makes it even worse. I mean, in the sense that, like, there's literally, I mean, I, I guess, I think your answer to that is no, you can't, we can't just affirm a district court that says the basis of my sentence is my finding that it's a million dollar amount of loss, when that's not the, and there's actually, that's wrong. It's, it's undisputed between the parties. It's not a million dollars in loss. Right, no, absolutely. If, if it's not supported, we think that the record supports, however, both the premise that Mr. Filicent was the mastermind and the undisputed amount of the fraud, and given that, and given the amounts that he received directly and the amounts he received indirectly. Again, I, I think the best way I can describe it is, you know, Robin Hood is responsible for everything he steals from the rich, even if he isn't in business with the poor, even if, even if he doesn't hand the money to the poor, if he simply knocks it out of the rich person's carriage and tells the person where to go get the money, he's responsible for that entire scheme. Responsible in what sense? I mean, response, criminal responsibility runs a gamut. You've got imprisonment, you've got restitution, and you've got criminal forfeiture, and so I grant you that he's, that Robin Hood is responsible in some way under the criminal law for what he has his subordinates do, but I'm not sure that King John could have, Prince John could have asked him to forfeit money that he asked a co-confederate to steal and keep. We think that the analogy that the court was using in Honeycutt, the farmer who grows marijuana, and, and then there's some college student who's selling it. The college student can't be held responsible for all of the profits that the farmer made from all of his salespeople, but... But why is that? Why can't he be responsible? The individual on the... Yes. Yeah, because he's low-level and he's No, no, no, no, no, that's not the reason the court gave. What reason does the court give in Honeycutt why he can't be responsible? Because he's not receiving any of the profits. That's the reason. Yes. Correct. It doesn't matter what role he has. He's not receiving the money, so you can't make him forfeit money he didn't get. But the farmer, the one who runs the proceeding, there are gonna be funds in that scheme that he's not directly receiving. If he has the college student take the money he receives and then use it to further the scheme in some way. Now, wasn't that issue in Honeycutt? The question, I think, is what do you do with a mastermind? Is the mastermind still... Is there no difference for the mastermind of a scheme? Is there no way in which you can say, Mr. Filassant, even if he had engineered the money so that it didn't go directly into his pocket, but it went to a place he directed, is that not still acquiring, deriving the proceeds of the crime? Go ahead. Let me ask you a quick question. Does it make any difference what statute you're going under? Because, of course, in the Supreme Court case it was under 853. The 982A2 language, same thing, proceeds a person obtains. But in this case there was also a 982A1 forfeiture, property involved in the offense. The statute doesn't say proceeds somebody obtained. Does that make any difference to you? I think it does, and that really ties to our point, that in this case the defendant... It's not just a fraud case, it's a money laundering case. And the money laundering here was both the receipt of the kickbacks, but more crucially, the use of the fraudulently obtained proceeds by the defendant to funnel them back into the enterprise to create the fraudulent forgiveness applications. And so, again, it's the defendant choosing where to use that money. And just like in a pill mill where they sometimes do legitimate tasks to keep the thing going, all of that payment, even if that payment wasn't into his pocket, it was still furthering the scheme. It was making his his customers happy. And so it was still involved in the money laundering, and that's the basis for the forfeiture. Did you seek forfeiture under both the fraud convictions and the money laundering convictions, or one or the other? I believe, and I'm just gonna confirm with my colleague here, I figured I'd have to introduce him, Joshua Pastor, Assistant U.S. Attorney. Okay, good to have him here too. If you're not sure, we'll figure it out. We're not sure, Your Honor. I believe it was, I believe it was under, at a minimum, the money laundering charges. Right, but you understand different language is used depending on what statute you're going under. That is true, and certainly in this particular case, the involved in makes a difference, because that is the way in which the proceeds were used. And We didn't, because we believe that it's, we believe in our honeycut argument, and we believe that it's still arguable that because he's the mastermind of the scheme, that he could have been the entire fraud. All the receipts, you know, even at the initial step, the first step of the scheme, again, this is kind of like Robin Hood. He's doing this, and he's benefiting these other people, but he's the engineer of the entire scheme. He's the one who's deriving the criminal property and choosing where it goes, just like he chose, you know, which shell companies the kickbacks would be paid to. So I mean, it seems like there are a lot of different ways that the District Court could have estimated the forfeiture. I mean, the District Court could have just said, look, I mean, could have estimated like $600,000, or could have just said $700,000. It could have just estimated it, but it chose this particular way. And that's, that's just, I guess that's my, my just hang-up is just, it seems like you're asking us to do the District Court's job differently, and to just think about how we would estimate the forfeiture, and in the process to like answer a bunch of questions about statutory interpretations, sort of novel questions, apply them to the facts of this case that no one has found. I mean, why, why isn't, I'll just return to my first question, like, why isn't the fact that the District Court said, this is the way I'm estimating it, and you agree that way is wrong. We would say, I think the best way I could put that is just like an oral pronouncement can sometimes over, take precedence over a written statement if it's an error. Here, we think what's pretty clear is that the, the court simply repeated the error that was in the government's proposed forfeiture order, but when you read the sentencing transcript, and you see the sequence of events, and you see the argument was made, and the judge's reaction to it, it's, it's clear to us that the judge understood that he was imposing a forfeiture amount higher than 549, higher than the amount that the defendant actually ended up with at the end of the day, and that was his intent. And so, while we agree there's an error, we think it's harmless for that reason. If the court wants more clarity, we understand, and, and we, I think, touching on Your Honor's question, at a new forfeiture hearing, we could ask for more money, and we could argue for a higher amount. That's not, that's not quite apparent. We have cases going both ways. Some of them let the government, let, some of those cases let the government try on a new theory with new evidence on remand, and some of them say, the government's had its one shot, it's over. So, you may have to fight that battle again if you get a remand. We might. I would, I guess I would say, though, at a minimum, we could get the court to provide more clarity as to what it intended. One more, one more question, at least for me. If your theory is, is right, then that 673,000 figure was just plucked out of thin air. You could have chosen 819, you could have chosen 925, you could have chosen a million two, you could have chosen 601,000, and any one of those would have been fine, right? Theoretically, yes, because. Does that make any sense? Well, I, I guess I would say there still has to be, it still has to be reasonable under the case law. It may not need to be with. I know, but does it, does it make sense for the government to pick out a forfeiture number that has no relationship to the case? If it's, if it's to the defendant's benefit. I, I, I agree, it shouldn't. The government can act irrationally if it's to the government, to the defendant's benefit. Well, it's not necessarily, I, I wouldn't say it was irrational in this case. As, as the court, I think, is, is divine. The error was in thinking that there had been kickbacks on all the loans, and that's what the basis for the number was. Well, the, the forfeiture amount has to be based on something, right? I mean, that's the point. It has to be like a reasonable estimate. And, and. I guess that's where I go to. I mean, the, it has to be based on something, and here it's based on something wrong. Here it's based on something that was ultimately incorrect and that the government corrected. But we've, again, we think still reasonable, and so that error is harmless. I, I think the court otherwise, well, is there any other questions? One, one quick question. Does it make any difference that this is a forfeiture judgment as opposed to an asset that's actually been seized? Does that make any difference under the law? Under the law, I don't think so. In practice, it raises the question as to whether or not the government would actually ever see any of this money, but I don't think legally it makes a difference. Thank you. Okay, Mr. Zuman, thank you very much. Thank you, Your Honor. Thank you for answering our questions. Thank you. Mr. Sagan. Just very briefly, the 673 is what the government pushed for at the sentencing hearing based on the error in trying to have the 10% apply to all of the loans, even the loans that he did not receive kickbacks for. That's where that number came from. The correct amount is the $549,000. I think we've already explained, um, why the, it should be limited to the $549,000. That was the government's theory, 673. They were wrong. They should be bound by the $549,000. Unless there's any other questions. Thank you. Okay, Mr. Sagan. Thank you very much. Mr. Zuman, thank you.